I'm sorry, we've got two appellants showing up here. I guess it's because of the cross-appeal. So who's going first? Mr. Franz? Okay. Please, the Court. My name is Robert Franz, the Attorney for City of West Linn. You know, ever since I've been 10 years old, no one's ever let me go first. So I'm going to use it wisely. That's why I'm a defendant. So I'm going to grab the chance. Okay. You know, because we do have cross-appeals and everything, I'm just going to go through kind of the claims for relief as they appeared in the complaint and just kind of respond. You know, the first issue, the two first claims, the State Inverse Condemnation Claim and the Fifth Amendment claim under the United States Constitution, you know, our position is that these aren't even taking claims, that the scheme that was followed in this case was a statutory, what was an ordinance based upon a statutory scheme set forth in ORS 223.297. And the way that scheme worked is you would apply for a development, and then the city would impose SDCs, system development charges. Then at that time, you could ask for deferment. And so let's kind of go through the steps that we did in this case without the actual amounts. They apply for their development. They get their conditions approved. It's now time for them to draw their building permits. So we issue SDC charges. And then at that point in time, they can ask some of those. And before this stage, we had the conditions of off-site improvements. Okay, so when you come to pay for your SDCs, you can say, listen, I can see my SDCs are $300,000. Can I defer those payments and draw my building permit now? And then when I finish the off-site improvements, the credits you're going to give to me, I would then like to offset my SDCs with those credits. And then the way the scheme works, if the off-site improvement exceeds your SDCs, then we issue credits. And so that was kind of the scheme in this particular case using the actual amounts. The total SDCs, when they first came in, you want to get your building permit. And I'm going to tell you, I'm going to say to you, your SDCs are $395,000. And I'm just rounding off. And so you say, you're conditioning me to build some off-site improvements. Can I defer those? And we say, yes, we're going to let you defer your street and water SDCs. And so you need to pay us $182,000. So what he did was he had gone out and purchased 95,000 credits for $85,000. Because on the market, the credits aren't always 100%. So he gave us credits of $95,000 that he had paid $82,000 for. And then he gave us cash of $87,000. And then he deferred $213,000. So then he does his project, and he does these couple off-site improvements. And the way the statute reads and our ordinance reads, you can get credits for your estimate. But they're pretty flexible in this situation, though. Mr. Frantz, I read your brief. I wasn't aware that this was the heart of the city's defense. You're completely leaving out, and maybe you were going to get to it later, the whole question of the vacation of the street and the easements. I mean, we're dealing with more than system development charges here. I'll go brief. I'll go a little bit faster for you then. Well, I mean, if this is really important, go ahead. I just didn't understand that. Yeah, I'm just responding to their first, their inverse condemnation. Okay, let me just cut to the chase. Our position is it's not covered by DOE. It's not covered by DOE? Not covered by DOE. This isn't even inverse condemnation. This isn't even a taking. If you're going to review what we did, it's a due process clause, rational basis. Because our position is if you read the Fifth Amendment and the state constitution, it says no property shall be taken without just compensation. It doesn't say no money will be taken without giving money back. Okay, so our position is that this has nothing to do with the taking. Our second main position, I want to just hit on that, is the waiver. Is that in this particular situation, the conditions were imposed. They made no objections. They went to the hearing and they urged these conditions be accepted because Albertsons was complaining of neighboring development. Then they codified in a contract all their agreements. So they did the public improvement guarantee contract. They agreed and signed to do all these things. So our position is that these conditions were imposed and you later agreed to do them and you have a contract to do it. It's a contractual relationship now. Let's go to what I appealed. I appealed the Green Street vacation. What we had in that situation, here's how 13th Street goes. It goes vertical. Then Green Street goes like this. Of course, it wasn't a street. Then they intersect. Then right in this corner is West End Corporate Park Development. So we have 13th, we have Green Street. Right above here is the Summerline Apartments, 450 units. They both applied for their development at the same time. So what the city said is, Summerline Apartments, you need to vacate Green Street. Otherwise, you have to pass through improvements. It's ridiculous for you to do half-street improvements on Green Street because it's really like this. You couldn't even build a road on Green Street. So you're like this. Then we said to West End, you need to vacate Green Street and do half-street improvements. So they petitioned to vacate Green Street. It actually would cross like this. Here's 13th, here's Green Street, here's Summerline, here's West Corporate Park. So they do a map to get consent from the neighbors. Right where the two intersections go, they excluded that on the map. They said this part's not going to be vacated. They got all the signatures of the owners. Then the city planner says, wait a second. I'm supposed to vacate the entire street. So I'm going to change the map and show this entire street vacated. So he changed the map and this entire street was vacated. The map was never given to the landowners. The map was never approved. That map, then when the city council, the city council completely eliminated Green Street. What they said then is, okay, when you eliminated Green Street, you gave us a chunk of that intersection. This is West End saying that. Because on the straight part of Green Street, half goes to this owner and half goes to that owner. But when you get to the intersection, what do you do? So they said, we got a corner of that intersection. We now own it. City, you now have to buy it from us if you're going to allow traffic to go up. Our first position is it was an improper vacation. Our second position is, if you take a cross section like this, this is a public road, this is Green Street, and you vacate it, then half should go down to this part of the already public road and the other half should go to this part of the public road. So that half comes to the city right away and the other half goes to the city right away and the street still stays the same. Their position is, no, you take a chunk out of that. Looking your way, the chunk would come out of this side. So our position is improper vacation. If you do divide it up equally, you go straight down. The road's still there. And third of all, every single draw in this entire project shows this street is open. It definitely was meant to be a street to access someone. It's just simply a mistake, if you want to call it a mistake, that the city planner did when he thought he had to vacate the entire thing across. What the trial court found is that, yeah, you vacated it, they became an owner of a quarter of it, and you own $5,000. So that's the Green Street. First Amendment portion, their position was that we have a building inspector. It shows you can see that part of the, there's a performance bond to do all the work for 10th Street. And there's pictures in the thing, but 10th Street makes a curb like this. And they put a sidewalk on this curb. Well, every time a truck went around the curb.  But they didn't exactly dream up the idea there'd be a sidewalk there, did they? I mean, the plans that they were given to do showed a sidewalk, and the State Department of Transportation accepted the improvements. And it turns out that, gee, we probably shouldn't have put a sidewalk there because trucks run over it and it's broken down, so we're going to make you do it the way we think now it should have been done. Well, that's not quite the same thing as just saying they put a sidewalk there. Well, they put a sidewalk, okay. But I think there's a huge difference between those things because basically you're saying, okay, the State Department of Transportation has accepted the improvements, but now it turns out they've been misdesigned. And so we're going to make you install the fix. I mean, isn't that what's happening here? Yeah, and who designed it? Westland Corporate Park. Fine, but they were satisfied with it, and the State Department of Transportation, who is specified to be the one that makes the decision, decided they were satisfied with it too. And I agree, and that's why you have maintenance bonds, so that you go for one year, and if you have a defective design, which the PIG agreement provided for, then you have a defective design, you need to repair it. Did it provide for defective design? It says that the approval of the city is relying on the developer to provide accurate and adequate designs, plans, and specifications. The city's action in approving the development, approving the construction plans, or inspecting the work shall not be a defense to any claim brought by the city against the developer or any bond for failure to comply with the applicable standards or specifications. Did they fail to comply with the applicable specification? Was the sidewalk not built in accordance with the specifications? The sidewalk was built with the specifications, but an improper design because it didn't allow a big enough radius or a radius for a truck to turn. I'm not sure that answers Judge Clifton's question. The question is, I don't read anything in that paragraph 10 that you just read to us that talks about defects in design. They built it according to the specification that ODOT approved, did they not? Well, they designed the plans, and, of course, the city approves the plans. And ODOT signed off. And ODOT signed off, but that's why you have that provision in there because when you approve plans, you're not guaranteeing the design. So your position is that that was not an adequate design? Correct. And that's what our expert testified at trial. Okay. And for that reason, then, is it Mr. Piotrski, is that how you pronounce it? Correct. The building inspector, the city inspector, was correct in refusing to release the performance bond. Correct. It was really a joint decision. He is not the one who made the joint decision, but that was his position. And let's just say it's wrong. It's still a good thing. Well, you've got an adverse factual finding that the trial court rendered that he was the official with final responsibility to make that decision, correct? And we're saying that it was insufficient evidence to make that factual finding. That that factual finding is clearly erroneous? Yes. I mean, don't we have to find it to be clearly erroneous? You have to prove he's the policymaker of the city to hold the city liable. Now, to hold him liable, I don't think you have to find that he's a final policymaker. To hold him liable, you'd have to say that what he did and the court found that what you did, Boris, is they said release the bond. You said you need to give us back that section of Green Street. Our position is that's not a matter of public concern. Well, okay, let's talk about that because I think as I read the case law, the question I had is isn't the question of public concern an issue that applies only to cases dealing with the speech by public employees against whom adverse employment action is taken by a public employer? What case imports that doctrine into, if I understand the argument correctly, the developer is saying I petitioned my government, the city of West Lynn, for redress of a grievance here, and in response to my First Amendment speech, the city retaliated against me by refusing to release a performance bond that I was otherwise entitled to have released, and we've got a finding by the trial court that that city official wrongfully withheld that release. I don't understand where you import this notion from the public employee speech into what looks to me to be just a plain old garden variety First Amendment case. Because the case law extends the same reasoning to private citizens. And what's your best case to support that extension? Well, you'd have to take a look at the one cited. I can't remember if Gernard, the Ninth Circuit Court case, but the cases that started with that were the towing companies and various agencies that were complaining they were knocked off the towing list because of First Amendments. They're cited in a portion of the brief. There's a couple cases that go right to that because I just read them last night, and that's what they say. What is the speech? What was the what? What is the speech? What is the First Amendment speech here? That's exactly my position. There isn't. Their speech, what they're saying is, remember, too, there's a contractual relationship in the performance agreement, okay? And it says that you guarantee these things. So Boris is, Boris and I have the same. But this is a complaining about a contract. The bond's going to be released if you provide us a maintenance bond. Okay, so he's saying release the bond under the performance agreement. Boris, let's assume because the factual findings against me, I have to assume that Boris said, I'm not going to release the bond until you give us back that portion of Green Street. So I don't know. Their contention to speech is me saying to you, give me my bond back under the contract. And we're saying that's purely a private dispute. It's a contractual dispute that has nothing to do with free speech. And I don't know what the petition is. I don't know what they're petitioning the government. You say to somebody, we have an agreement that you're going to give me the bond back, give it to me. If that's a petition, then that's the petition. Well, the notion of petitioning for grievances would include a more personal or individual grievance. Why isn't this a petition for grievance? Well, if you're going to say that under a contract you petition for something, I suppose it could be a petition for grievance. Well, it's in the First Amendment. The cases that this area is going to that you guys must be handling a hundred of are these inmate cases. I mean, I looked at the Ninth Circuit. It looks like there's 20 of them. And they're saying we grieve this to the prison and this is what we got in return. So I think you're probably correct. Under a contract, you could say it. But this is still a private dispute. This isn't a matter of public concern. It's a dispute between two people giving the bond back. One other thing I want to say before I sit down on that. Is that my time? Yeah. I was just going to ask, did you want to reserve some time for rebuttal? Yeah, why don't I just reserve a couple minutes. But let me just make one comment. The trial court made us return the bond back in without giving us a maintenance bond back, which our contractual, which they had to contract me. In other words, the agreement says that when we take our performance bond back, we will give you a maintenance bond. And the trial court just said baloney. What is the status of the project now? I assume that the buildings are being occupied. Buildings are fully occupied. We went back and fixed five sidewalks. Okay. And so we still have the dispute over the vacation, the validity of the vacation. And we have a dispute over whether or not the city owes damages to the developer. Right. And the road's being used, so I'm not sure what dispute we have with the vacation. I mean, the road's being used. Right. Okay. All right. Thank you, Mr. Frantz. Mr. Willis? May it please the Court, I've got a terrible cold. I'll stand close to this. Keep that microphone close. Your voice is very soft. Your Honors, let me run backwards a little bit because he went first. With respect to holding on to the relief we got, which was an inverse condemnation case on that partial intersection, the city went through all of those steps. The engineers that we paid for to do the work told them, we don't think you want to do this. We were met with oral and written instructions both saying, yes, we do. You must do it. You go back, redo it, redesign it, resurvey it, and bring it back to us. They came in the entire piece. And we did that. There wasn't anything that was mistaken or inadvertent. They later wrote in a letter claiming to have been inadvertent, which was simply unsupportable, telling us we want it back. And at that point in time, there had been so much tension in this, and we have to understand the context. This was a suburban city south of Portland that had just been going through a lot of controversy over no growth, slow growth. They had taken many public positions. This is all in the record about those issues. So it was very much in the public fore. And then there had been other controversy on this from the get-go that had been going on. And when they told us to vacate that, and we said, pay us for it, please. It isn't much. They would not do that. They took all these other steps. They insisted that, and frankly, so terribly wrong, the judge rejected it, as a matter of fact. And he had testimony from Alan Brickley, which was I think almost a 40-year-experienced lawyer dealing with these things, that their positions were inconsistent with the document they relied on to put vehicular access across a bicycle and a pedestrian path. They recorded a document purporting to let the public use it, threatened to have criminal prosecutions and everything else against my client if they did anything to interfere with the city's use of that property, and the court found that was a taking. And with respect to the argument that- Was the property, in terms of its use, did it ever stop being used as a road? It's not entirely clear, Your Honor. I don't want to say that because somebody up there did do it. Well, my client didn't, but somebody up there, and I suspicion it was the Summerlin apartment people, did put some paving on it, and I've assumed, but I don't know this and I can't represent the record shows it, that they had to get a permit from the city to do so. Was it not paved before? I'm sorry? Was it an unpaved road previously? It wasn't done. Summerlin was going to build the apartments north of this project, and so the street didn't extend that far, and that was the point. It didn't extend that far north at the beginning. But it does now. The last time I saw it, there was a picture in the record showing that someone had paved portions of that. Yes, they had clearly done it over top of what had been vacated, which was our property. Okay. So we still have the issue then remaining as to whether or not the city owes the developer money for the value of the property. That's correct. And as relief we did get, and we got it under both state and federal constitutions, but Judge Ash Vansta said properly so, made the federal taking alternative to the judgment on the state constitution because the federal claim will not arise if we get fully compensated under the state. And we also got attorney's fees for that, so the remedy came out exactly identical, but the Fifth Amendment and the supporting attorney's fees under 1983 are alternative on that portion only to what we had under the state takings. Could I ask you, just so that it's clear on my mind, when the street was vacated, you got title to the property. Yes, Your Honor. And now the city, in effect, wants to take it back. In fact, what the judge found was the city did take it back. Did take it back. They physically did it. And they say, well, we didn't do this in conformity with, this wasn't vacated in the manner that it should have been properly done under the applicable law, and therefore the vacating it to begin with was wrong, and therefore it renders your claim, they want to, in effect, rescind the vacating of this property. Now, I understood their position to be that, and Judge Eichmanskas, I think, properly rejected it for several reasons. One was that if you have the order of the city council, they can express determinations that after proper notice under the statute, that all elements required by the statute for vacation were met, and that everybody went home. What difference does that really make? Are they the ultimate arbiter of fact on that kind of question? I'm sorry, Your Honor? Well, in fact, it is the current position of the city, and I don't think I've seen anything inconsistent with that, that the proper procedures were not followed to vacate the property, that the neighboring property owners did not sign off on what was actually put into effect. So does the recitation, if that's the case, and if it's not, you can tell me, but if that's the case, I'm not sure what the impact of the recitation by the city council is. The formal recitation, entry of that order, according to our brief, also would have stopped them from making any claim to the contrary. But did you do anything in reliance upon the city council's statement? Yes, we did. We went forward and we went through the vacation process when they made us do it, and we thought we had satisfied everything that we were supposed to have done. And yes, we did do that, but the other part of this, Judge, and I'm not at all certain, it's clearly the city's burden on this to show that there's a defect sufficient to render it void ab initio or some concept like that. I don't believe this record will support that. And when you go back to the record and what that city council did with the ability of having their attorneys and everybody else with them, I don't think this record shows what all the city had in front of it when it did that. I thought it was just a simple matter of the description of the property as reflected in the map changed after the property owners had been notified of the proposed change. In essence, that their consent to the vacation was misinformed because that really wasn't what they were giving consent to. And my point, though, Your Honor, is I don't think this record will support a conclusion that somehow that didn't happen at the time of the hearing to support those findings and legal conclusions that the city didn't make at that time. Well, that goes back to the question I posed at the beginning. What is it that makes the city council the final decider of that question? I mean, did the council make a finding of fact that, in fact, all the neighboring property owners were properly aware of what was going to be done? They did. Or did it just make a recitation? And why is the city council the body that makes that determination? The American statutes clearly vest the city council with the power to vacate a street. That's not answering my question. Because ordinarily when you challenge that would suggest that no action by the city could be ultravera because the city is the final decider for whether the city is going to take action. But that's not the question. The question is whether the city's action was in accordance with the state statute. The council can recite all at once that it was, but if the court determines that it's not, I don't understand what the significance of the city council's recitation is. Well, but all I'm saying is it was their affirmative defense, which was equitable in nature, trying to rescind. And, of course, because of that, we have a different standard and also a difference to Judge Hayes-Szymanski's for rejecting it. But all I'm submitting to you is I don't think that record is clear enough for anybody to tell this court with clarity that there wasn't something that occurred at that time that would have said to the city council they would have had some evidence in front of them saying there was sufficient notices. Well, I've read your briefs, and I haven't seen proof offered up that, in fact, the developer of the apartments signed off on a plan that eliminated access to the apartments. I mean, that's the part that strikes me as brain dead on the part of the city planner, and there'd be no expectation on the part of the apartment developer that he's going to sign off on a plan that takes away the access that he thinks he's got. There's no evidence that I've seen that suggests the developer did sign off on that plan. And I agree with you. If that's the case, then what are you telling me when you're saying we can't tell from this record? If you concede to me that the developer of the apartment didn't sign off on a plan that gave up the access to his property, and that's what the state statute requires, then what's the missing piece? I don't concede that because the developer, Ned Oleski, clearly was aware of his obligation to vacate Green Street, as were we, and he did agree to that. There's no question about that. He did. Did he agree to vacate the part that meant he wasn't going to have access to his property anymore? Yes, because both parties were notified that the city said, you must do this. And Ned Oleski went forward also. He didn't complain. And part of the reason was, if he didn't vacate it, he was going to have to spend a fortune trying to build Green Street. And his development, Your Honor, did have access from other areas. From the other side of the property. This wasn't the sole access into it. And he was going to get a bicycle path for his 438 apartments down to a new park and everything else, so it had some amenity value to him also. But what I'm trying to suggest, and I haven't done a very good job, is focusing exactly on what was in front of the city council at the moment when they made these findings. I don't think the record shows us that. And it's the defendant's burden to do that, and they didn't, and I don't think they can tell you that there wasn't sufficient evidence to support it. But that, again, presumes that what was before the city council was the key question. And I just don't understand why that's the key question. Why is it the city council's determination as to whether the requirements of the state statute have been satisfied? Because they're just delegated to do it. And if it wasn't there, all I'm saying is that I don't think the record says it was or was not there sufficiently for a defendant who has the burden of that issue to win. Especially when you look back at Neduleski's testimony and the fact that he got benefits from this and he was also conditioned to do it and did do it, he has agreed. So I think there is sufficient evidence to support that. Counsel, could you help me? I'm looking at his oral findings at supplemental excerpt of record 206, which is page 9 of the transcript. Maybe your colleague could... And I'm looking, beginning at line 7, where he talks about the effect of city ordinance 1439, which I assume is the ordinance that the council adopted addressing the vacation of Green Street. Yes. He seems to say, starting at line 7, that the effect of the ordinance was to vacate the entire street, all of Green Street. But then he goes on to talk about the fact that the vehicular access easement, starting on line 12, filed by the city, exceeded the scope of the utility easement and is therefore invalid. Perhaps I'm not understanding what he's saying. I read that to go back to Judge Clifton's question as saying that the vacation was invalid, which I guess we lawyers and judges would say is an act that is ultra viris. I don't think that's what he had in mind, Your Honor, because when this vacation occurred, the city retained the pedestrian access and the utility line access through there. They never gave that up. It was the vehicular access service. So they just retained an easement for pedestrians and utilities? Yes, and that's what he's referring to here. And then to overcome the problem, the city did, and certainly, Your Honor, the city certainly acted as though that it was vacated because he went through all these steps. They argued they had the power under this reservation to turn it into a vehicular access. That's what Judge Eisman, I think, is rejecting here. It's invalid. Can I ask you how much money is involved in this? How much money is involved in this particular? I'm sorry, Your Honor. How much money is involved in this? Intersection? Yeah. A little over $5,000 plus the attorney's fees. Is that what this appeal is about? Is that what this whole dispute is about, attorney's fees? Otherwise, it doesn't seem to me to pay the litigator over $5,000. Well, we definitely can understand why they wouldn't pay that small amount, but the claim is much bigger, and I'd like to get to that. And that is the court, I think, is correct about the public nature of the speech. There's much more in the record that supports this. Let me start with that context. But there's testimony by Mr. Kelly, for instance, where is the speech? His phone was ringing off the hook when all this happened, and he had meetings in his office, for instance, with the Chamber of Commerce, trying to work with the city councilors, trying to have a better relationship for development. So there was all over the place. It was a very broad context and very much a public concern. These are public improvements. These are streets. They're massive water systems. There's all these improvements. So do you agree with Mr. Franz that this whole doctrine of public concern is relevant? No. I think it's wrong, Judge, but I'm saying there's more than ample facts that support that it was public anyhow, if that's the law, because you look at all this. But what I'm asking you, tell me what the law is. You heard my question to Mr. Franz. What's your answer to the question I asked him? My position is that that doctrine does not apply to anything other than what the court has said. Public employees talking about their employment, because you have to do the balancing required, and the tolling case, he said, the court that did that analyzed that, just like a contractor providing service to the government, and that's a U.S. Supreme Court. I can't remember which one it was, but they analyzed it the same way. I can tell the court I know of no case that has extended that doctrine beyond that, and I don't think it should because you don't have the same balancing. If you go back to Pickering and Connick and the cases that came from, you have all that. And those are all school teacher cases. Those are all public employee cases. This court's own case was decided by the defendant the same way. The firemen who complained about the way the police treated the person they were taking off in the ambulance, that's another public employee case. They all are. Could I ask you again about what the speech is here? I mean, it seems to me that he refused to release the bond because they refused to do something else. And I don't know what is the free speech here. I mean, I think the city in its briefs says, specifically, Piatsky refused to release the bond until WLCP conveyed an easement to the city for the disputed Green Street intersection. In other words, the retaliation was the refusal to release the bond, and the alleged reason for the retaliation was the plaintiff's refusal to convey an easement. So there you have what I see as a dispute. And he says, you know, we won't release the bond until you do this. I don't see where the ‑‑ I mean, what I see here is a dispute. And I don't see any First Amendment. The record shows, Your Honor, that Bishop County complained loud and long about this. And it's the night ‑‑ But that's not what the court below said, was I conclude as a matter of law, and that's a separate question, how he could conclude as a matter of law as opposed to a matter of fact, that the failure to release the performance bonds was motivated by Boris Piatsky's intention to retaliate against the plaintiff for exercising its First Amendment right in regard to its refusal to dedicate the disputed intersection to the city and to reconstruct the 10th Street corridor improvements. So I don't ‑‑ I mean, what I see here is a dispute. And he said, if you won't do this, I won't do that. And I don't know what the speech is here, and I don't know how he could ‑‑ how can he also ‑‑ how can he conclude as a matter of law that the failure to release the performance bonds was motivated. All I can point you to is in the record was the testimony about the complaints that were made about that by Mr. Kelly. It wasn't just a simple saying no, he complained about it. He tried to get them to back away from it. We had meetings out there with lawyers and him and other ‑‑ I mean, this was amazing at the level of the discussions and complaints that went on over this case that trying to get them to back away, they simply wouldn't. So they made an adverse decision to him. He said they complained about the adverse decision. He said, no, I won't change my decision. I don't ‑‑ maybe I'm missing something. And bear in mind, Your Honor, that also Mr. Piyoski suffers from the credibility finding expressed by Judge Ashpanskas. Well, I don't know that he ‑‑ I don't know. Maybe it was a slip of the tongue, but he said he concluded as a matter of law that the failure to release was motivated by Piyoski's intention. I don't know what that means as a matter of law. How can he conclude as a matter of law? Perhaps because the evidence was so overwhelming. Well, perhaps. But that's subjective on my part, Your Honor. But let me point out that something else that occurs here. In addition to that, Piyoski credibility finding. And this ‑‑ they're saying here that Piyoski was told by Bond and Herbie that Piyoski was told by the Bonding Company to release this. Take a look at this. I know, but he's got ‑‑ here you have a public official who is making arguably an erroneous decision that he doesn't want to release the Bond until you, until someone before him does something else. I won't release the Bond until you do X. I don't see where the First Amendment comes into play. It may have been arbitrary. It may have been capricious. You may have had a remedy for it under Oregon law. I don't know, you know, in New York they would call it an Article 78 proceeding to compel somebody to do a duty that they're obligated to do. But I don't see it as a first ‑‑ I don't see it as a ‑‑ I can only submit that when you complain to your government, that's the heart of the First Amendment. I can't imagine any other way on a principle basis to say when you complain to your government about the way it's treating you and performing its public duties, that it is not protected by the First Amendment. But it wasn't really the speech that even the oral finding points to. It does make reference to First Amendment rights, but it wasn't the speech. It was in regard to refusal to dedicate the disputed intersection to the city. The substantive position, well, is taking a substantive position, something that's protected by the First Amendment, or is saying if you won't do this, then we're going to do that? I'm not sure that's a ‑‑ as far as Judge Horman is concerned, I'm not sure that's a speech or a petition issue. Well, I just submit that it is, Your Honor. I don't know what else I can do. Wouldn't that make any disagreement between a public official and a citizen on the subject of a First Amendment dispute? You ask for something, I don't want to give it to you, and I say, I don't know how I want to give it to you, but I want you to do ‑‑ Well, beyond that, there was retaliation to not give it, and I'm going to ask you, I'm going to run out of time, please look at their brief, because they've misstated to you this public employment guarantee. They say it covers this. It doesn't cover this. Read the whole thing in Paragraph 7. They make sharp distinctions between the Republic improvements and the off‑site improvements. Piyoski claims the bombing company told him to do this. It was his saying. Mr. Franz retreated when that said, and the judge found Piyoski not believable that that was never stated. And so we have a city determined that it's not going to provide us what the Constitution provides. I'm sorry, I just haven't been able to get to the Dolan issues because they're huge, but please keep in mind also when this release issue that's briefed to you, that does not cover those water improvements that they hid from us, and that on that, I think certainly Dolan applies. It's no different than if we had a yard full of pipe and bedding material and the government came and just took it out of there and said, hey, we're going to use it. They took it. Physical things that they took from us, property. It doesn't make any difference. Is it really a taking if your client has entered into an agreement to do it? We did not enter into an agreement to do it. We were compelled by the conditions to do it exactly what Dolan speaks to. In order to get our development permits, we were conditioned we had to do that in order to get those development permits. And the Oregon law is very clear on this. I mean, if you look at Nelson and Clark, those are Oregon cases that are good law. They've never been overruled, and they control. I don't know how Judge Ashmascus completely overlooked them, but Nelson was an en bloc decision from the Court of Appeals. And it's straight up, and I don't think that anyone can avoid that with respect to the Oregon law and that we should be entitled at least to the permits of what we've got and a reversal of remand on both of our other members' cases, the 10th Street improvements. And before I'm going to run out, one last question. You will have to get past the release to help me on the 10th Street improvements inverse case. Yeah, I was just going to say that's pretty clear language in the release. How do you get around it? I understand. Two things. One of them, it only applied to existing claims. First, it doesn't cover anything other than 10th Street. The water is not covered. But two things. It only covers existing claims. When that release was negotiated and done, it was the same set of lawyers, myself that represented the Dolan family in the trial court on the inverse case when it came back from the Supreme Court, Mr. Franz and Mr. Romath, who represented the city of Tigard, were in the same positions they took, that these inverse cases do not arise until the physical transfer of the property occurs. It gave me great comfort when it said existing. That hadn't happened. Those developments were not completely turned over at that time. That's one point. But the dispute was still there. Pardon me? You still had a disagreement over this particular issue. Yes. Well, I don't know whether that issue was ever debated, whether it had or had not arisen at the time. We later had the debate over it. But the other part was you heard Mr. Franz stand here and tell you very clearly that Mr. Piotrowski demanded a redesign of that 10th Street curvature. Incidentally, it didn't come from Westland Corporate Park. The record shows it came from Kettleson, their engineers, did the geometry and gave it to us, but it was all approved by ODOT. But the redesign demanded by him, look at the language on the release document that says, in Mr. Kelly's testimony how important it was, that that release was critical, that ODOT approve the design of these things so he knew what it was he had to build and ODOT would be the arbiter of whether or not it met it. All that happened after he was in a terrible spot and gave up huge amounts to get the city to let him go forward and then they turned right around and went right back to the pretty beginning. We demand you redesign this, not just put new concrete in. You redesign it and rebuild it. And that's a clear breach of that agreement. Well, what did the city promise? This is the other question that I have. In return for release, the city agreed to issue a temporary occupancy permit, as I understand it. And they did issue the temporary occupancy permit. What else was the city required to do that constituted a breach? They were required to have that agreement on the design approved by ODOT. That was in the same language, Your Honor, and that was critical. But that was done, wasn't it? Pardon me? But that was done. Yes, but then Mr. Piotrowski later breached that by saying, You don't have to redesign up on 10th Street. You have to redesign it and redo it. I understand, but it's not clear. Maybe I'm missing something. The city made a promise and kept its promise. Then later on it decided it wanted other things, but I don't see how it breached the settlement agreement that it reached. I don't know what clause in that. Could you point me to a clause in the agreement that it breached? I'll ask my partner if he can get that for me, Your Honor, and I'll point out the language. Well, just as a general proposition, overreaching or even breaching a term of the contract does not necessarily void the contract. And I guess in this context it seems to me that that agreement covered so many different bases that the fact that he later overreaches and seeks to impose upon your client the cost of replacing and redesigning and whatnot that curb, is that so material a demand that it causes everything else that's been agreed to to be thrown away? That's our position, Your Honor, because if you look at the language that was placed in it, the remedy was provided for. It said if this is materially breached, it's void. Does that mean that your client doesn't have occupancy permits anymore or shouldn't have had occupancy permits during the time in question? Because that's mostly what your client got out of it, the opportunity to occupy the property or the building sooner. Well, the language I'm reading from our brief, Your Honor, at page 39 where it quotes the document, Which one of your briefs? Our first opening brief, Your Honor. Why don't we look at the agreement? Let's look at excerpt of record, page 124, which looks like the Fenton's Trial Exhibit 512. Are we all on the same page yet? I'm not sure if I have it. Excerpt of record 124, Defense Exhibit 512. I have it. I'm sorry, Your Honor. I do have it. All right. So what language were you about to refer to? If you go down to the first, second, and third paragraph. Second and third lines from the bottom. Yes, it starts with a freestanding. Right above there, it has the language that, And you have the testimony on this, also, of how important that was because of this problem of trying to get the city... What's the above-referenced agreement? The above-referenced agreement are the series of letters, Your Honor. There was a back-and-forth series of letters that this release document, partial release, was a part of. And that was that they were going to give the temporary occupancy permits, some of them, at a time when we delivered three documents. Incidentally, the record shows also they did not. The testimony of Tina Granados delivered those three documents. They knew that Mr. Kelly had a gun to his head because he had a doctor trying to move into an office, and they let her cool her heels for half an afternoon and then sent her away and wouldn't give her the permits. Mr. Willis, as I read the clause that you just directed, it says, Until such time as the first temporary occupancy is allowed by the city. And that happened, right? The temporary occupancy permit issued after the release was entered. So I don't understand how you could come back and void the agreement if that contingency has already occurred. We believe, Your Honor, you need to read that in conjunction with the testimony. I admit, I think this is ambiguous. I don't think it's clear either way. But then again, when you go back to the function of the... Well, if it's ambiguous, then the trial court basically found that the release covered the 10th Street claims. I understand the difficulty in that, Your Honor. But what I say is, I hasten to add, this does not cover the water improvement claims in Willamette Falls Drive. It has nothing to do with it. And if we lose this, we lose this. And I would like to point out two other things, if I may. Mr. Franz says that, in his view, this is not a takings case. It's not a Dolan case. It doesn't apply. Dolan had, to my mind, two key components. One was that the government demanded that something be given up for public use and that the ownership of that actually transferred. It was in an adjudicatory, ad hoc setting. Now, what do we have here? We have an adjudicatory, ad hoc setting, setting these conditions, before a hearings officer that was authorized by the city to do it. He was their final actor on that. The staff recommended those conditions, and he adopted them. And that's what we had to do if we were going to build this development. So you have the ad hoc. Do we have the transfer of the property interest? Yes, we do, very clearly. Let me just stick with the waterline for that. We had to put in, I think, I can't remember, it was a 20-inch or 18-inch waterline, 1,400 feet of it, and had it be dug out, bedding put down, laid down, leveled, tested, and delivered, and the city accepted it. Clearly, that's not ours anymore. It belongs to the city. But the property didn't belong to you. The materials did, the pipe. And you paid to dig the trench and install the pipe and fill it over, but you never had title to any of that. Of course we did. Well, you owned the material and the labor, but that's not the same as owning the land, is it? That's true. There's no question about that. But then that's where I say the Oregon Colonial Appeals opinion, and Clark was faced with a nearly identical circumstance, and it held that causing a person to do improvements on adjacent public land, there's no difference. And what would the difference be? In fact, we have the California Supreme Court that did the same thing. We have the Texas Supreme Court and the power man, Cass, did the same thing. And we have the Oregon Court and Clark, which controls the state inverse, doing the same thing. And that's where I think that where Judge Ashmascus really went off, because that's law, and with due respect, he was plainly wrong. And as an example, I think I mentioned this before, but what would you say if we had our pipe and our bedding materials out here in a yard and the city crews came over and just took them and used them? Of course that's a physical taking. And, of course, because of Nelson, you don't need to do this rightness argument. There's nothing left to find out. You know what we put in the ground. You know what property it was that was transferred. There isn't any issue about what we can do with our property. That's a very finite, very discreet, objectively determinable thing. But you're mixing personal and real property, and I'm not sure that case law makes the distinction you're asking us. Well, I submit to you that Clark and that power man cases do exactly that. There was also the case in Washington we cited. I don't remember the name. We'll take a look at those cases. I've let you go way over, and the argument's been, I think, somewhat helpful to us. And let's give Mr. Frantz the final word. A couple quick points. The performance public informants improvement guarantee, ER 214, entitled agreement. Developers shall complete all required public improvements, and it's signed by West Corporate Park. They say these were imposed on them. Initially they were imposed, but then they entered into a contractual agreement to do it without further compensation. So they did agree to do it. Second point, the person that applied for the vacation of Green Street was Mike Nedoleski, the owner of Summerline. Now, Mike Nedoleski would not have petitioned for a vacation of Green Street if he knew he was going to block access by the petition. Mike Nedoleski also signed the consent, ER 114. The consent he signed was on the wrong map, and it was the map ER 121, that showed it would not be vacated. So that's why it doesn't matter what the city did. Mike Nedoleski is not going to, not, is not going to, you know, you understand the point I'm making? Yeah, well, I mean, that's Judge, I think Judge Clifton explored that. So then what are we left with? We have, what, an ultra viris act by the city council approving the vacation of property or land that did not comport with Oregon state law. And it's a no employment deed, there's no vacation. Well, yeah, but somebody has to have title to it, so. It goes back to the way it was before the vacation. Which would, what, revert back to the 1902 deeds or something? I mean, to determine who has the. We do. It reverts back to us. Back to the city. It reverts back to us. Does the property owner have any claim for expenses or costs that may have been incurred in connection with what the city was doing? I mean, I don't. Not on the theory they put. Well, could they have an estoppel claim? Well, how can you be estoppel from doing something illegal? The problem with the people that suffer is Mike Nedoleski. He has no access to his apartment. A city cannot be. If we do something illegal, we can't be estoppel. It's not to protect us. It's to protect the landowners who consented. Yeah, the situation here, though, is, and I'll clean up the language, but it's, you know, this line from Animal House, somebody screwed up, you trusted us. And that's sort of what's going on here. The city shoves this down the throats of the property owners. And at least somebody, by the end of, by the time it gets to the city council, at least the plaintiff here asserts that he kind of was up against it and had no choice and knew what was happening and tried to tell them not to do it, but they were doing it anyway and the city did it anyway. And then, oops, sorry, never mind. Well, it does something seem amiss about this if the city is trying to take back everything it did on the premise that it was doing it wrong. Somehow the city's wrongful conduct shouldn't absolve the city of responsibility for what it actually did. So there's some, I understand your legal point, but there's also something perverse about the point that you're forced to argue, which is that we screwed up, so don't hold us responsible. The city was not advising city council there's a screw-up. The planner changed the map. No, the city council didn't know. No one knew until after this. Well, the mistake is by the planner who, with blinders on, was so determined to make certain all of Green Street is vacated. But that's still the city, and if the city's error here is driving the justification you're offering for the city not being responsible for what it did, there's something perverse about that. And that's why I requested the court to remand this to the city council to square it away. We would have squared it away. We would have exempted out the intersection like it was meant to do. We would have vacated it and everything would have been fine. And that's what I was asking them to do on one of my claims. And then the final point, just to give you the law on the First Amendment, it's at page 52 of our brief, and I looked up last night this White Plains Towing Corporation, and I took a quick look at the cases, and what they're doing, they're saying in First Amendment cases we're going to extend the same rule that we have to public employees to private citizens. But wasn't White Plains Towing operating as an agent of the city in that case? No, it's going to be an independent contractor, which is very close to this situation of a contractor, a contractual agreement. We'll take a look at White Plains. Thank you very much. Can I ask you one more question? I'm just curious. I mean, this thing is being litigated for $5,000, this particular claim. I'm sure that more than that has been expended on legal fees. Is there any reason why this case hasn't settled? Well, because of the demands, the million-dollar demands on the first two claims. So this claim couldn't settle separately? They found this claim and they stuck it in their complaint. What's the amount of the judgment at this point? On the First Amendment? It was like $5,000 and $13,000, something like that, because the plaintiff's claim with regard to the off-site improvements was rejected, but that's what's still here in the form of the appeal. But the preliminary award of attorney fees was, correct me if I'm wrong, Joe, $365,000. So they awarded $365,000 against this. In attorney fees? Yeah. Okay. Do we have anything further? All right. The case just argued is submitted and will be adjourned until tomorrow morning. Thank you all.
judges: Tallman, Clifton, Korman